# IN THE COURT OF COMMON PLEAS OF THE STATE OF DELAWARE

# IN AND FOR SUSSEX COUNTY

DENISE DUNCAN,                    )
                                  )
                                  )
          Plaintiff,              )
     v.                           )     C.A. No. CPU6-14-000469
                                  )
JBS CONSTRUCTION, LLC,            )
                                  )
          Defendant,              )

Submitted February 1, 2016
Decided March 31, 2016

*Victoria J. Hoffman, Esq., attorney for Plaintiff*
*Tasha M. Stevens, Esq., attorney for Defendant*

## DECISION AFTER TRIAL

The Court is called upon to resolve a dispute between Plaintiff homebuyer Ms. Denise Duncan and Defendant homebuilder and vendor JBS Construction, LLC, regarding the construction of a new home. The Court must determine whether an express warranty existed, and if so, whether it was breached. The Court is also asked to decide whether Defendant breached the implied warranty of good quality and workmanship, and whether Defendant negligently constructed the home. The Court heard testimony and gathered evidence during a two-day trial held December 2, 2015 and December 21, 2015. This is the Court's decision.

## FACTUAL BACKGROUND

1

In June 2011, Plaintiff entered into contract to purchase from Defendant a newly constructed home, located at 10838 Concord Road, Seaford, Delaware ("Home"). Defendant is the builder-vendor of the home. The parties contracted for a home inspection contingency, but not a homeowner's warranty in the sales agreement.[1] Final home inspection occurred on July 27, 2011 by an inspector of Plaintiff's choosing. Mr. Bruce Wardwell, owner and member of Defendant JBS Construction, LLC ("Mr. Wardwell"), testified that he received a copy of the Plaintiff inspector's report and fixed the deficiencies noted by the inspector. Prior to settlement, Plaintiff became a paid employee of Defendant, professionally cleaning its newly built homes. In that capacity, Plaintiff professionally cleaned her own home. Settlement thereafter occurred on August 4, 2011.

Plaintiff testified that at settlement she received a Warranty Welcome Page. This document states the homebuyer may have JBS Construction, LLC do walkthroughs within the year after purchase to address warrantable issues.[2] Furthermore, Plaintiff testified she received two warranty booklets, one around the time of settlement and another in February 2012. Plaintiff testified she believes she received the first booklet at or close to the time of settlement because she wrote move-in details on the cover. Mr. Wardwell does not recall giving Plaintiff a warranty booklet at settlement, but agrees he gave Plaintiff a warranty booklet in February 2012. However, Mr. Wardwell testified he told Plaintiff it was not a warranty but rather was given to explain what constituted a

---

[1] Plaintiff's Exhibit 16.
[2] Plaintiff's Exhibit 19.

2

construction deficiency. Plaintiff did not pay Defendant or Mr. Wardwell money for either warranty packet.

After settlement, Plaintiff expressed concerns such as the following about her home to Defendant: cracks in some walls, unlevel floors, a gap between the floor and the wall in the kitchen, malfunctioning windows and sliding door, wavy paint/drywall, a water leak around her side door, and sand deposits in her washer and toilet tanks. Plaintiff submitted photographs of these concerns to the Court. Plaintiff testified she called Mr. Wardwell approximately 10 times about the items needing repair, beginning in November 2011. Plaintiff stated Mr. Wardwell came to the home twice and Defendant's painting subcontractor came once, but that no workmanlike repairs were completed. Mr. Wardwell testified he went to Plaintiff's house five or six times to address her concerns. Mr. Wardwell said some of Plaintiff's complaints were unfounded but that there were several valid problems that he or his subcontractor repaired satisfactorily.

In July 2012, Plaintiff's attorney contacted Defendant about Plaintiff's concerns.[3] Plaintiff's attorney sent a similar letter in September 2013, along with an inspection report prepared by Plaintiff's expert witness Mr. John J. Heyn ("Mr. Heyn").[4] Mr. Heyn inspected Plaintiff's home on April 25, 2013, and identified the following issues and provided the following repair cost estimates:

1. Roof rafters need metal bracket hangers at the ridge beam

---

[3] Plaintiff's Exhibit 22.
[4] Defendant's Exhibits 1 and 2.

2. The roof deck panels should have 1/8" separation between the panels and metal separation clips are required to achieve this separation. ($ 10,500 in total to repair item 1 and item 2)
3. Bathtubs lack access panels ($ 550)
4. Uneven framing at the gable ends in the attic ($ 500)
5. Sand deposits in the toilet tanks
6. Settlement crack over closet door in master bedroom ($ 1,500)
7. Uneven ceiling joints in living room ($ 2,000)
8. Heating/cooling duct is bent 180 degrees ($ 500)

Mr. Heyn speculated all of the above-listed defects would have been detectable to an experienced home inspector at the date of purchase.

Mr. Heyn also testified the following minor issues existed: uneven drip edge molding, cracked sidewalk, rust on the foundation, bedroom floor squeaked, kitchen cabinet damage, door bell was installed horizontally rather than vertically, and the door latch was misaligned. The estimated repair cost for the minor issues is $ 2,500. Plaintiff's expert noted in his report that the minor issues and some of Plaintiff's other concerns were not "major problems or they were within tolerances."[5] He also testified that he did not find the minor issues problematic.

Plaintiff additionally prays for the following damages: Plaintiff alleges she paid Defendant $ 125 for the installation of a third outside spigot, which Defendant failed to install.[6]

Finally, Plaintiff asserts she purchased a warranty for her washing machine,[7] and that this warranty was voided as a result of the sediment in her plumbing system.

---

[5] Defendant's Exhibit 1.
[6] Plaintiff's Exhibit 15.
[7] Plaintiff's Exhibit 22.

4

Plaintiff purchased replacement parts for her washing machine, allegedly on account of the sand, as well.[8]

## DISCUSSION

### Express Warranty

Plaintiff argues Defendant provided a one-year express warranty on the home, and that Defendant breached this warranty by not addressing warrantable defects or by failing to make workmanlike repairs. Defendant disputes that an express warranty was given, but says to the extent a warranty existed, it was legally unenforceable because it lacked consideration. Plaintiff argues her work for Defendant cleaning homes was the consideration for the warranty. In support of this argument, Plaintiff points to behavior by Defendant that suggests it acquiesced to the warranty obligation.

It seems clear from the testimony and evidence before the Court that the parties believed some type of warranty existed. However, consideration is required for an express warranty to be enforceable.[9] In this case, the parties did not include a homeowner's warranty in the sales agreement.[10] Plaintiff testified she believed the home came with a warranty. However, the terms of the contract are clear. Section 31 of the sales agreement states if the parties leave an item blank, it is waived.[11] The line next to

---

[8] Plaintiff's Exhibit 23.
[9] *See Council of Unit Owners of Breakwater House Condo. v. Simpler*, 1993 WL 81285, at fn. 3 (Del. Super. Feb. 18, 1993).
[10] Plaintiff's Exhibit 16.
[11] *Id.*

5

homeowner's warranty is blank.[12] Thus, the Court does not believe Plaintiff relied on the existence of an express warranty to enter into the home sales agreement. Therefore, the Court must look for a separate consideration, other than the purchase price of the home.

Testimony is clear that Plaintiff did not pay money for any of the warranty documents she received at or around settlement or in February 2012. Around the time of settlement, Plaintiff began working for Defendant. She ceased working for Defendant around January 2012. Mr. Wardwell testified Plaintiff was paid for this work. He testified some of the payment was not monetary, but rather was the installation of upgrades in the home. Plaintiff raises for the first time in her responsive closing statement that the homeowner's warranty was at least some of her payment for the cleaning work. It is difficult for the Court to address this argument as it was not raised during trial nor does the support offered – Defendant's behavior – clearly speak to whether Plaintiff's work was in consideration for the warranty. It merely shows what was already clear to the Court from testimony and evidence; the parties believed some type of warranty existed.

Plaintiff has not shown by a preponderance of the evidence that consideration was given for an express warranty. Thus, the warranty agreement between the parties was gratuitous and cannot be enforced. Regardless, in the Court's view, the "warranty"

---

[12] *Id.*

6

booklets offered to Plaintiff are best understood as an enumeration of what Plaintiff is entitled to under the implied warranty of good quality and workmanship.

## Implied Warranty of Good Quality and Workmanship

The implied warranty of good quality and workmanship presumes that contractors in the business of building new homes have "the requisite skill" to perform the work they offer and thus that "the work shall be done in a skillful and workmanlike manner."[13] Work is "workmanlike" if it is reasonable.[14] Compliance with building code is required.[15] However, the implied warranty does not "entitle the customer to excellence."[16] Additionally, the implied warranty only protects against latent defects, or in other words, "those which are not obvious or not discoverable by a reasonable inspection."[17] Plaintiff must prove breach of the implied warranty by a preponderance of the evidence, which requires her to have "the greater weight of the evidence" on her side.[18]

Both parties agree Defendant is in the business of building new homes. Thus, Defendant's work must have been completed in a skillful and workmanlike manner. The issue is whether Defendant breached this implied warranty. Plaintiff made many

---

[13] *Bye v. George W. McCaulley & Son Co.*, 76 A. 621, 622 (Del. Super. 1908).

[14] *Healy v. Silverhill Constr., Inc.*, 2009 WL 295391, at *4 (Del. Com. Pl. Feb. 5, 2009) ("Work is performed in a workmanlike manner if the builder 'displayed the degree of skill or knowledge normally possessed by members of [its] profession or trade in good standing in similar communities' in performing the work.") (citations omitted).

[15] *Estall v. John E. Campanelli & Sons, Inc.*, 1993 WL 189500, at *3 (Del. Super. Apr. 30, 1993).

[16] *Carey v. Estate of Myers*, 2015 WL 4087056, at *24 (Del. Super. July 1, 2015) (citations omitted).

[17] *Council of Unit Owners of Breakwater House Condo. v. Simpler*, 1993 WL 81285 (Del. Super. 1993) (citations omitted).

[18] *Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967).

7

workmanship complaints during testimony. The Court will address the items for which she seeks damages.

Mr. Heyn testified an experienced home inspector would have been able to detect the following deficiencies. Plaintiff had a home inspection prior to settlement with an inspector of her choice. The Court considered this when weighing the evidence.

## Roof Rafters

Metal bracket hangers were not used to hold the roof rafters to the ridge beam.[19] Both parties agree the construction of Plaintiff's home must conform to the 2003 International Residential Code ("IRC") building standards.

Mr. Heyn testified IRC R804.3.2.4 required Defendant to use metal bracket hangers at the ridge beam. However, R804.3.2.4 is not in the 2003 IRC. Mr. Wardwell, who has significant expertise as a general contractor with hands-on construction experience, testified R804.3.2.4 is in the 2009 IRC. He further stated Rule 804, in general, sets the standards for a type of roofing not used in Plaintiff's home. According to Mr. Wardwell, metal bracket hangers are unnecessary. He cited IRC R802.3 to support this argument. The relevant part of the rule reads "rafters shall be framed to ridge board or to each other with a gusset plate as a tie." Mr. Wardwell interprets this provision to mean rafters can be framed to the ridge board or, alternatively, rafters may be framed to each other so long as a gusset plate (metal bracket) is used. Since the rafters were framed to the ridge board, no gusset plate is required. Plaintiff urges a different reading

---

[19] Plaintiff's Exhibit 2.

of R802.3. She argues the gusset plate requirement also applies when the rafters are framed to the ridge board.

On this issue, Mr. Heyn's testimony is not credible. Mr. Heyn did not merely misstate a rule or section number, but referenced standards for a type of roofing not at issue in this case. Furthermore, since either proposed reading of R802.3 seems equally plausible to the Court, Plaintiff has not demonstrated by a preponderance of the evidence that Defendant breached the implied warranty of good quality and workmanship.

<u>Bathtub Access Panels</u>

Mr. Heyn testified Defendant failed to install bathtub access panels as required by the IRC plumbing code P2704.1. P2704.1 states "fixtures with concealed slipjoint connections shall be provided with an access panel or utility space at least 12 inches…in its smallest dimension…so as to provide access to the slip connections for inspection and repair." Mr. Wardwell testified the bathtub tub drain is a slip joint connection, and that it is accessible through a utility crawl space that is at least 12 inches.

The Court reviewed the relevant code but cannot, based solely on its read, determine whether access panels on the wall are required in this case. Thus, given the conflicting witness testimony on the issue, credibility becomes key to the Court's determination. Though it is clear Mr. Wardwell, as an owner of JBS Construction, LLC, is not a disinterested witness, the Court found his testimony to be forthright and well-informed. Mr. Wardwell consistently consulted his IRC code book while testifying and throughout the proceeding relied on the applicable version of the code.

9

Given Mr. Wardwell's credibility coupled with Mr. Heyn's previous error interpreting the IRC, the Court cannot find Plaintiff demonstrated by a preponderance of the evidence that Defendant breached the implied warranty of good quality and workmanship regarding the access panels.

## Roof deck Panels

Mr. Heyn did not see a 1/8" separation between the roof deck panels in Plaintiff's home. Hclips were not used to achieve panel separation. Mr. Heyn testified roof deck panels are required to have a 1/8" separation between each panel to allow for the natural expansion and contraction of wood. Mr. Heyn further stated that the panel manufacturer prints a stamp on each panel that states metal hclip use is required to achieve the 1/8" separation. Mr. Heyn did not have a photograph of the stamp, but says he saw it on the panels while inspecting Plaintiff's attic. In support of his position, Mr. Heyn cited a TECHTIP table.[20] A footnote on that table indicates hclips can be used as edge support.

Mr. Wardwell agrees a 1/8" separation between deck panels is required, but testified that Defendant's roofing subcontractor complied with this requirement by using nails as spacers. Mr. Wardwell testified he supervised Defendant's roofing subcontractors. He speculated that the separation was not visible when Mr. Heyn inspected the property, 1.5 years after the roof installation, since the wood panels expand and contract. On cross, Mr. Heyn agreed that if no clips were used, it would be

---

[20] Plaintiff's Exhibit 14.

possible to observe less than a 1/8" separation even if the panels were initially installed 1/8" apart. Mr. Wardwell stated he had never seen a manufacturer's requirement for hclips stamped on a roofing deck panel nor did he see such a stamp on the panels in Plaintiff's attic. Defendant introduced a 2015 roof deck panel that Mr. Wardwell testified was the same type used in Plaintiff's home. Mr. Wardwell testified that regardless of manufacturer, all panels are identically stamped with TECO requirements.

Since both witnesses agree a 1/8" separation between roof decking panels is required, the Court will first determine whether Plaintiff has shown by a preponderance of the evidence that Defendant failed to install the roof decking panels with the required 1/8" separation. Plaintiff argues that because Defendant used subcontractors to do the framing and roofing, and because there is no evidence substantiating Mr. Wardwell's claims that he supervised these subcontractors, Mr. Wardwell may not have sufficient knowledge about whether the roofing was properly installed. Plaintiff submitted an item actual cost detail document showing that only Defendant's subcontractors were paid for framing and roofing work.[21] Mr. Wardwell testified that document only shows payments made for physical labor. It does not include supervisory work.

The item actual cost detail document contains costs for "labor" and "install" work, and supplies. This indicates to the Court that it only reflects Defendant's costs for physical labor and materials. It cannot be used to show Mr. Wardwell or other JBS employees did not supervise roofing installation. Furthermore, the Court found credible

---

[21] Plaintiff's Exhibit 42.

11

Mr. Wardwell's testimony that he and other JBS employees supervised construction. Since Mr. Heyn testified that separation, even if originally present, might no longer be visible if hclips were not used, the Court cannot find that the panels were not initially installed with the requisite 1/8" separation between panels.

Mr. Wardwell testified that hclips were not used to achieve separation. Thus the Court's next inquiry must be whether Plaintiff has demonstrated these clips are required by the panel manufacturer.

First the Court will examine the evidence the witnesses used to support their positions. Mr. Heyn referenced the TECHTIP table. The table is not strong support that hclips are always required. Though the table states that hclips can be used as a type of edge support, the table also has a column titled "without edge support," which suggests hclips are not always required. The table does not provide insight into whether edge support was necessary in this case. Furthermore, the Court cannot put much weight on the roof deck panel presented by Defendant. The board was manufactured later and appears to be a different thickness than the one used in Plaintiff's home. The issue is whether the manufacturer of the particular panels in Plaintiff's home printed an hclip requirement on its boards. Defendant offered this panel to show the federally mandated TECO stamps, which are printed on boards by every manufacturer, do not contain hclip requirements. There was no testimony that a manufacturer cannot put an additional stamp on its board. Thus it is not clear this board helps answer the question of what may or may not have been printed on the boards in Plaintiff's home.

Once again, the Court is left with conflicting testimony. Mr. Heyn went to Plaintiff's home with the purpose of inspecting the property, which suggests he had the opportunity to carefully examine the roof deck panels. However, in light of Mr. Wardwell's expertise, supervisory and hands-on work in home at issue, and demeanor on the stand, the Court found Mr. Wardwell's testimony credible, too. The Court cannot determine that one witness is more credible than the other, thus Plaintiff has not met her burden on this item.

### Additional Attic Framing

Mr. Heyn testified the gable ends of Plaintiff's attic are framed improperly because they are not framed evenly at either 16" apart or 24" apart. Plaintiff's Exhibit 2, Photograph B, shows the framing. Mr. Heyn indicated the problem is with the two beams on the right. When asked the distance between all the beams photographed, Mr. Heyn said it "looked like" the one on right was 24" or more apart, then 18" apart, then 12" apart, and then approximately 30" apart. Mr. Wardwell testified the boards are an even 24" apart, but that an extra board was inserted to secure the ridge beam.

The Court found credible Mr. Wardwell's testimony that the third board, which is one of the beams indicated as problematic by Mr. Heyn, is an extra support for the ridge beam. Once that third board is accounted for, the Court cannot tell merely by looking at the picture whether the remaining boards are an even 24" apart. It is unclear from the testimony how or whether Mr. Heyn measured the distances between the gable framing. Moreover, the Court cannot rectify his estimates with the photograph shown. Once again the Court must decide between two witness' estimations of the

distances between the boards. Neither seemed more credible than the other, thus the Court cannot say Defendant breached the implied warranty of good quality and workmanship.

## Settlement Crack over Master Bedroom Closet

Mr. Heyn testified there was a settlement crack over the master bedroom closet in Plaintiff's home. He said the crack was indicative of a framing problem, and that settlement cracks always indicate problems. Mr. Wardwell testified settlement cracks are typical occurrences as a new home goes through the seasons. Several photographs of this crack were submitted into evidence.

Once again, the Court must contend with conflicting testimony. The Court cannot find the settlement crack over the closet door indicates Defendant breached the implied warranty of good quality and workmanship.

## Ceiling Joints

Mr. Heyn stated the ceiling joints in the living room were uneven, which is indicative of subpar workmanship. When asked by Defendant whether what was seen could be attributable to the natural expansion and contraction of wood, Mr. Heyn said no because the amount of unevenness in the drywall was too great, and because he did not see any cracks in the joints. However, Mr. Heyn's report notes he did see cracks.[22] Mr. Heyn said cracks would be indicative of structural problems if they were greater than ¼". However, he could not remember the size of the cracks he saw. Mr. Wardwell testified if the ceiling joints were uneven, cracks would be visible. Mr. Wardwell did not

---

[22] Plaintiff's Exhibits 9, 10.

remember seeing any cracks or unevenness on Plaintiff's ceiling. Mr. Wardwell also doesn't remember Plaintiff raising this issue prior to the Mr. Heyn's report.

If neither witness recalled seeing the cracks, it is likely that any cracks present were small, or in other words, hairline rather than structural. The Court cannot see any unevenness or cracks in the photographs submitted with Mr. Heyn's report. Moreover, the Court puts some weight on Mr. Wardwell's testimony that Plaintiff never raised the ceiling drywall problems prior to Mr. Heyn's inspection. Though Plaintiff is not an expert and would not be expected to spot hidden defects, Mr. Heyn testified this workmanship problem would cause uneven drywall and Mr. Wardwell testified this defect would cause cracking. Plaintiff provided photographs and gave testimony about other instances of wavy drywall and cracking in the home, indicating to the Court that there is reason to believe she might have noticed a similar problem if it existed on her ceiling. The Court does not find Defendant breached the implied warranty of good quality and workmanship.

### Heating/Cooling Duct

Mr. Heyn testified a heating and cooling duct in Plaintiff's home is bent 180 degrees and thus restricts air flow. Mr. Wardwell testified the entire HVAC system was inspected after settlement and no problem was reported. He disagrees the photograph submitted with Mr. Heyn's report shows a kink in the duct. He also testified Plaintiff never complained about airflow problems in the house.

15

Plaintiff is not an expert and might not realize her HVAC is performing suboptimally. However, Mr. Wardwell's testimony about the prior inspection will be given weight. Once again, the Court found neither witness more persuasive. The Court cannot find Plaintiff has met her burden.

## Minor Workmanship Issues

Mr. Heyn testified about the following minor workmanship problems in the home: sidewalk cracks, kitchen drawer damage, a gap along kitchen floor behind the refrigerator, floor squeaks, uneven drip edge molding, rust stains along the foundation, doorbell installed horizontally rather than vertically, and a misaligned door latch keeper. Mr. Heyn testified he did not find these issues problematic. His report also notes that these problems are either minor or within tolerances.

A homebuyer is entitled to reasonable workmanship, but not perfection.[23] Moreover, these issues are patent defects; Plaintiff could have discovered these issues with a reasonable inspection of the home. Defendant did not violate the implied warranty of good quality and workmanship.

## **Negligent Construction**

Plaintiff must demonstrate Defendant breached a duty owed to Plaintiff and that this breach proximately caused damages to Plaintiff.[24]

---

[23] *See supra* notes 15, 17.
[24] *Malinak v. Kramer*, 2012 WL 174958 (Del. Com. Pl. Jan. 5, 2012) (citing *Culver v. Bennett*, 588 A.2d 1094, 1096–97 (Del.1991)).

16

In this case, Plaintiff argues Defendant, as a general contractor, had a duty to supervise and direct the work of its roofing and framing subcontractors. Plaintiff contends Defendant was negligent because it failed to inspect and direct the subcontractors' work, resulting in flawed roofing and framing.

Defendant acknowledges it had a duty to supervise its subcontractors' work.[25] Defendant argues it fulfilled its duty, that there are no defects in the roofing or the framing, and the construction was not done negligently.

First, Plaintiff has not proven damages. The Court considered whether the framing and roofing were defective, *supra*, and could not find that they were by a preponderance of the evidence. Furthermore, Plaintiff's reliance on the Actual Cost Detail document to demonstrate breach of duty is misplaced. That document only records the dates employees or subcontractors purchased materials or performed physical labor. Supervisory work is not therein accounted. Thus, just because a JBS employee was not paid on the dates framing or roofing subcontractors worked, does not mean they were not there supervising. Mr. Wardwell's inability to recall specific dates he supervised work at Plaintiff's home does not convince the Court that he was not there supervising. Mr. Wardwell testified that both he and Defendant's co-owner supervised the subcontractors, and the Court found this testimony credible. The Court cannot find Defendant breached its duty, and Plaintiff has not demonstrated Defendant was negligent.

## Miscellaneous Damages

---

[25] Defendant's Answer.

Plaintiff testified she purchased several upgrades to her home, one of which was an outside spigot. She alleges Defendant failed to install the spigot. Plaintiff introduced a July 23, 2011 invoice showing she was charged $ 125 for the spigot.[26] Defendant did not address this complaint. Plaintiff's testimony, in conjunction with the invoice, seems credible to the Court.

Plaintiff is awarded $ 125 to compensate her for Defendant's failure to install the spigot.

Finally, Plaintiff argues the warranty she purchased for her washing machine was voided on account of the sediment in her plumbing system. She seeks compensation for this and for parts needed to repair the washing machine. Plaintiff submitted a photograph of sand her the washing machine filter. Both Mr. Heyn and Mr. Wardwell testified they saw sediment in Plaintiff's plumbing. An employee of Willey and Company, the subcontractor that installed the well and septic at Plaintiff's home, also testified about the sediment problem.

Defendant argues Plaintiff's testimony cannot be used to establish why the warranty was voided. The Court agrees; Plaintiff's testimony about why the warranty was voided is inadmissible hearsay. Though Plaintiff was party to a contract with Home Depot for a warranty on her washing machine,[27] she cannot speak for the company about the reason it allegedly canceled the warranty. Because there was no

---

[26] Plaintiff's Exhibit 15.
[27] Plaintiff's Exhibit 22.

reliable testimony offered as to why Home Depot may have voided the warranty, Plaintiff may not recover damages.

It is clear from the evidence before the Court that there was sediment in Plaintiff's plumbing. Since the well was subsequently replaced by the State, the well was likely defective. The Court awards Plaintiff $ 64.16 for washing machine parts based on her testimony of the need for repairs and the receipt for parts. The other damages requested by Plaintiff in her complaint that were not addressed at trial are deemed waived.

## CONCLUSION

The Court finds no express warranty existed between the parties, thus Defendant did not breach an express warranty. The Court also finds Plaintiff failed to prove Defendant was negligent. Additionally, Plaintiff did not show Defendant breached the implied warranty of good quality and workmanship for anything but the well installation which was subsequently replaced at no cost to the Plaintiff. Since no reliable testimony was offered about why the washing machine warranty may have been voided, Plaintiff is not entitled to reimbursement for the warranty. Finally, the Court awards Plaintiff damages for parts to repair the washing machine and for the outside spigot. The Court finds Defendant liable to Plaintiff in the amount of $ 189.16.

**IT IS SO ORDERED,** this 31 day of March 2016.

The Honorable Rosemary Betts Beauregard

19